**United States District Court**
For the Northern District of California

1
2
3
4
5
6          UNITED STATES DISTRICT COURT
7          NORTHERN DISTRICT OF CALIFORNIA

8
9    DEREK E. TURNER and MARI TOBIN              No. C 09-00683 MHP
     BLOME,
10              Plaintiffs,                       **MEMORANDUM & ORDER**

11      v.                                        **Re:** Cross-Motions for Summary Judgment;
                                                  Motions to Strike
12   KRIS PLAFOND; MARGARET PLANKA;
     DANIEL SCHNEIDER; CALIFORNIA
13   HIGHWAY PATROL COMMISSIONER J.A.
     FARROW; THE GOLDEN GATE BRIDGE,
14   HIGHWAY AND TRANSPORTATION
     DISTRICT and Does 1 through 20,
15
                Defendants.
16   _____/

17
18          On February 17, 2009, Derek Turner filed a Complaint against California highway Patrol

19   (CHP) Officers LaFond and Planka, alleging various violations of Turner's state law and federal

20   law-based civil rights. Docket No. 1 (Complaint).  Plaintiff Blome was not named as a plaintiff in

21   the original Complaint.  On October 20, 2009, this court granted Turner leave to file a First

22   Amended Complaint ("FAC"), adding as plaintiff Mari Tobin Blome and adding as defendants CHP

23   Commissioner Farrow, the Golden Gate Bridge, Highway and Transportation District ("District")

24   and various CHP officers. Docket No. 32 (Memorandum and Order Granting Plaintiff's Motion to

25   Amend Complaint).  Now before the court are plaintiff Blome's motion for summary judgment,

26   defendant CHP Commissioner Farrow and CHP officers' motion for summary judgment, defendant

27   District's motion for summary judgment, defendant District's motion to strike and plaintiff Blome's

28   motion to strike.  Having considered the parties' submissions and arguments, the court enters the

United States District Court
For the Northern District of California

1  following memorandum and order granting plaintiff Blome's motion for summary judgment;

2  denying District's motion for summary judgment; granting in part and denying in part defendant

3  CHP's motion for summary judgment; denying defendants' motion to strike and denying plaintiff's

4  motion to strike.

5

6  BACKGROUND

7  I.      The Golden Gate Bridge

8          Unless otherwise noted, the following facts are taken from the Joint Statement of Undisputed

9  Facts (JSUF). Docket No. 97.  The Golden Gate Bridge ("Bridge") is one of the most recognizable

10 structures in the world, and it is a major tourist destination.  A major arterial highway as well, it is

11 the only direct vehicular connection between Marin County, which lies to the north of the Bridge,

12 and the City and County of San Francisco, which lies to the south of the Bridge.  The Bridge

13 roadway and its approaches are public highways and are governed by the District, formed pursuant

14 to Cal. Street and Highways Code §§ 27000, *et. seq.* Docket No. 71 (District's Motion) at 3.

15         On average, the Bridge rises 220 feet above the San Francisco Bay.  The Bridge is 90 feet

16 wide, and its roadway includes six traffic lanes.  The four middle lanes are ten feet wide, and the two

17 outer lanes, which border each of the Bridge's sidewalks, are eleven feet wide.  There are no

18 shoulders between the Bridge's outer roadway lanes and the Bridge's sidewalks.  Rather, the

19 Bridge's sidewalks are bordered by moving vehicular traffic on one side and by an outside railing on

20 the other side.  The four-foot high steel and wire outside railings of the Bridge's sidewalks face the

21 San Francisco Bay to the East and the Pacific Ocean to the West.  The sidewalks are separated from

22 moving traffic by a 54-inch steel public safety railing that is itself mounted on a steel barrier eleven

23 inches higher than the sidewalks.  In addition, the sidewalks themselves are slightly higher in

24 elevation than the roadway.

25         The Bridge's sidewalks are approximately ten feet at their widest points and five feet at their

26 narrowest points.  The narrowest points are at the anchorages located at the north and south ends of

27 the Bridge, where the sidewalks go past concrete pylons.  When open, the Bridge's sidewalks are

28

2

available to all members of the public.  Pedestrians may use the East sidewalk while bicyclists alone

may use the West sidewalk.  Pedestrians and bicyclists share use of the East sidewalk on weekdays

before 3:00 p.m., when the West sidewalk is closed.

II.    Security on the Bridge

Each day during daylight hours, the District's security personnel patrol the Bridge's

sidewalks on bicycle, on foot or on scooters, and they regularly monitor the activity on the Bridge's

sidewalks from patrol cars.  In addition, the District uses a network of surveillance cameras to

continuously monitor the sidewalks, and the District operates a public address system that may be

used to directly address members of the public on the Bridge's sidewalks.  This system includes

speakers at the south approach to the Bridge's sidewalks and the Bridge's emergency telephone

system which also functions as a P.A. system from which District employees may address persons

within the vicinity of any of the emergency telephones.  This system is used to deliver instructions in

times of emergency and for crowd control purposes.  The CHP has jurisdiction to police the Bridge

and maintains a constant and visible presence, with one or two officers deployed at the Bridge

twenty-four hours a day.  The CHP frequently deploys additional officers to the Bridge, including a

regular bicycle patrol on weekends.  The Unites States Park Police ("USPP") and the National Park

Service ("NPS") rangers also work on the Bridge and are in communication with the District's

dispatch center at all times.

III.    The Ordinances

The District promulgates a Master Ordinance that regulates activity at the Bridge, including

expressive activity.  Each individual ordinance adopted during a calendar year with continuing

validity is incorporated into a newly adopted Master Ordinance in the subsequent year.  With respect

to expressive activity, the versions of the Master Ordinance in effect from 2002 through February

26, 2009, including the Master Ordinance 2007 which is at issue in Turner's as-applied challenge,

mandated that all persons and groups, including individuals and groups of less than 50 persons

(hereinafter "small groups"), receive a permit from the District in order to engage in expressive

activity.  During this time, the Master Ordinance also required that permit applications for

United States District Court
For the Northern District of California

1   expressive activity be submitted to the District a minimum of four business days in advance of the

2   date that the expressive activity was to take place.

3        On February 27, 2009, the District amended the Master Ordinance to allow individuals and

4   small groups to engage in expressive activity without a permit so long as there was no use of signs,

5   props or musical instruments.  Any expressive activity involving the use of signs, props or musical

6   instruments, including the expressive activity of individuals and small groups, continues to require a

7   permit.  The District most recently amended the Master Ordinance on September 25, 2009, and these

8   amendments are incorporated into the Master Ordinance 2010, adopted by the Board of Directors of

9   the District on May 14, 2010.  *See* Docket No. 75 (Witt Decl.), Exh. K (Ordinance Amending Master

10  Ordinance 2009).  No other changes were made to the District's regulations regarding expressive

11  activity, and plaintiff Blome challenges five provisions of this version of the Master Ordinance as

12  they apply to individuals and small groups.

13       The Master Ordinance 2010 includes the following regulations, among others, that apply to

14  expressive activity: (1) a permit is required for any expressive activity involving the use of signs,

15  props or musical instruments of any kind; (2) applications for a permit to engage in expressive

16  activity must be submitted at least four business days in advance of the date that the expressive

17  activity will take place; (3) bull horns and other sound amplification devices are prohibited; (4) all

18  signs must be handheld and may not be attached to or mounted on poles, sticks or any other device

19  used to hold the sign; and (5) no permits are issued for expressive activity on weekends between the

20  hours of 2:00 p.m. and 11:59 p.m.

21       Specifically, sections F.4(a) and F.5(a) of the Master Ordinance are permitting requirements

22  applicable to individuals, small groups and large groups alike.  Under section F.4(a), speakers

23  engaged in expressive activity[1] using signs, props or musical instruments must first apply for and

24  receive a permit from the District.  Section F.4(a) states in relevant part:  "All Expressive Activity

25  on the Bridge Sidewalks . . . that involves holding signs, props, or musical instruments requires a

26  permit regardless of the number of the participants."  Section F.5(a) further qualifies the permitting

27  requirements found in F.4(a), providing that:

28

4

**United States District Court**

For the Northern District of California

1

2

3

4

> Requests for Expressive Activity permits must be submitted at least four (4) business days prior to the date the Expressive Activity will take place. Business days for purposes of this section means Monday through Friday, excluding all holidays recognized by the State of California. Applicants are encouraged to request a permit for Expressive Activity with as much advance notice prior to the activity as feasible but no more than eighteen months prior to the date of the Expressive Activity.

5   Taken together, sections F.4(a) and F.5(a) eliminate spontaneous speech involving the use of signs,

6   props and musical instruments on the Bridge's sidewalks.

7           Section F.8(c) states in relevant part: "All signs and props must be handheld; they may not be

8   attached or mounted to poles, sticks, or other devices that are used to hold the signs or props."

9   Section F.8(b) provides: "No person may carry or use bull horns or sound amplification devices on

10  Bridge Sidewalks."  Lastly, section F.6(d) provides: "Permits for Expressive Activity on the Bridge

11  Sidewalks will not be issued (1) when the Bridge Sidewalks are closed to pedestrians; (2) on

12  weekdays from 6:00 a.m. - 10:00 a.m. and 2:00 p.m. - 7:00 p.m.; or (3) on weekends and holidays

13  from 2:00 p.m. to 11:59 p.m."  Plaintiff Blome alleges that these five provisions of the Master

14  Ordinance 2010 are facially unconstitutional as applied to individual speakers and small groups.

15  IV.   Derek Turner

16          On April 9, 2008, the Olympic Torch Relay ("Torch Relay") passed through the City of San

17  Francisco.  Derek Turner, a peace activist, traveled to AT&T Park, home of the San Francisco

18  Giants, to intercept the Torch Relay and display a sign that read, "China: Extinguish the Flames of

19  GENOCIDE in Darfur."  After learning that the Torch Relay route had changed, Turner located the

20  Torch Relay route on Bay Street in San Francisco and was able to hold his sign there as the Torch

21  Relay passed by.  Believing that the Torch Relay path would subsequently pass over the Bridge,

22  Derek Turner next traveled to the Bridge in order to display his sign there in protest.  Turner,

23  however, had not obtained a permit from the District to engage in this expressive activity.  Once at

24  the Bridge, Turner stood on the south end of the East sidewalk, just north of the Golden Gate Bridge

25  Gift Shop.  Turner held aloft the sign which was approximately two to two and a half feet tall by five

26  feet wide, stood an estimated three to six inches from the concrete barrier separating the sidewalk

27  and the roadway and held his sign so that it faced the Bridge's toll plaza (located at the southern end

28

United States District Court

For the Northern District of California

1   of the Bridge) and faced the vehicular traffic heading north on the Bridge.  After determining that

2   Turner did not possess a permit as required by the Master Ordinance 2007, in effect on that date,

3   CHP Officers Planka, LaFond and Schneider approached Turner and Officer Schneider first directed

4   Turner to put his sign away.  Turner refused and the CHP officers proceeded to take the sign from

5   Turner by force, putting Turner's hand in a pain-compliance control hold.  Although the CHP

6   officers seized Turner's sign, Turner was not arrested and he subsequently left the scene.

7   V.   The Claims

8            On October 13, 2009, Blome and Turner filed the FAC alleging the following causes of

9   action: (1) against defendant CHP officers, plaintiff Turner alleges a violation of the First and

10  Fourteenth Amendments under 42 U.S.C. § 1983; (2) against defendant CHP officers, plaintiff

11  Turner alleges a violation of Article 1, Section 2 of the California Constitution; (3) against CHP

12  Commissioner Farrow and the District, plaintiff Blome alleges a violation of the First and

13  Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983; (4) against

14  defendant CHP officers, plaintiff Turner alleges a violation of the Fourth and Fourteenth

15  Amendments' proscription against unreasonable search and seizure under 42 U.S.C. § 1983; (5)

16  against defendant CHP officers, plaintiff Turner alleges a violation of the Fourth and Fourteenth

17  Amendments' proscription against excessive force under 42 U.S.C. § 1983; (6) against defendant

18  CHP officers, plaintiff Turner alleges a violation of the Fourteenth Amendment's proscription

19  against the deprivation of due process of law under 42 U.S.C. § 1983; (7) against defendant CHP

20  officers, plaintiff Turner alleges a violation of Article 1, Section 13 of the California Constitution;

21  (8) against defendant CHP officers, plaintiff Turner alleges a violation of Cal. Civ. Code § 52.1; (9)

22  against defendant CHP officers, plaintiff Turner alleges battery; (10) against defendant CHP

23  officers, plaintiff Turner alleges false imprisonment; (11) against all defendants, plaintiffs Blome

24  and Turner seek declaratory relief; and (12) against all defendants, plaintiffs Blome and Turner seek

25  injunctive relief. Docket No. 29 (FAC).

26

27

28

United States District Court

For the Northern District of California

LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–55 (1986).  A fact is "material" if it may affect the outcome of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.  The court may not make credibility determinations. *Id.* at 255.  The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed R. Civ. P. 56(e); *see Anderson*, 477 U.S. at 250.

DISCUSSION

I.      Plaintiff Blome's Motion

The court first considers plaintiff Blome's motion for summary judgment.  Blome asserts that she is entitled to summary judgment on her section 1983 claims regarding the five allegedly facially overbroad restrictions on expressive activity found in the District's Master Ordinance.  Specifically, plaintiff argues that each ordinance is unconstitutionally overbroad as applied to individuals and small groups numbering less than 50 persons.

"In a facial overbreadth challenge, there is a broad focus on the entire range of behavior affected by the statute, and whether the unconstitutional applications of a statute are substantial in relation to the statute's legitimate effect." *Roulette v. City of Seattle*, 97 F.3d 300, 312 (9th Cir. 1996) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).  "Because the overbreadth must be substantial, 'the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *United States v. Kaczynski*, 551

1  F.3d 1120, 1126 (9th Cir. 2009) (quoting *Members of City Council of City of Los Angeles v.*

2  *Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)).  Rather, "[a] statute is facially overbroad when its

3  application to protected speech is substantial, not only in an absolute sense, but also relative to the

4  scope of the law's plainly legitimate applications." *Id.* (quoting *Humanitarian Law Project v.*

5  *Mukasey*, 509 F.3d 1122, 1136-37 (9th Cir. 2007) (quoting *Virginia v. Hicks*, 539 U.S. 113, 119-20

6  (2003))) (internal quotations marks omitted).

7       A.   Standing

8        "To maintain [a] challenge to the provisions of [an ordinance,] . . . appellant[] must establish

9  constitutional standing with regard to the provisions challenged.  To do so, [appellant] must allege

10 (1) a distinct and palpable injury-in-fact that is (2) fairly traceable to the challenged provision or

11 interpretation and (3) would likely ... be redressed by a favorable decision." *Santa Monica Food Not*

12 *Bombs v. City of Santa Monica*, 450 F.3d 1022, 1033 (9th Cir. 2006) (hereinafter *Food Not Bombs*)

13 (citing *Allen v. Wright*, 468 U.S. 737, 750-51 (1984) (internal citations and quotations marks

14 omitted)).  Plaintiff Blome has standing to bring this facial challenge.

15       Blome is a peace activist who lives in the Bay Area and who frequently visits the Bridge to

16 protest war and to express a message of peace.  As a part of her expressive activities, Blome utilizes

17 "signs, props [and] visuals" to convey her message. Docket No. 76 (Veit Decl.), Exh. 2 (Blome

18 Depo.) at 37:2.  Blome asserts that she is unable to engage in spontaneous speech using signs, props

19 or visuals on the sidewalks of the Bridge without fear that the five restrictive provisions of the

20 Master Ordinance would be enforced against her.[2]  Accordingly, Blome's "apprehension that" the

21 Master Ordinance "would be enforced against [her] for engaging in activities protected by the First

22 Amendment without a permit is sufficient to establish an injury-in-fact and support a facial

23 challenge." *Food Not Bombs*, 450 F.3d at 1034 (stating additionally that the fact that a plaintiff has

24 not applied for a permit pursuant to the ordinance in question does not defeat plaintiff's standing).

25 Blome meets the second and third elements of standing because her injury-in-fact is directly

26 traceable to the five provisions here in dispute and her grievances "would likely be redressed by a

27 decision in [her] favor." *Id.*  Thus, Blome appropriately brings this facial overbreadth challenge.

28

United States District Court
For the Northern District of California

B.    <u>The Ordinances</u>

The five ordinances in question regulate speech on the Bridge's sidewalks.  Defendants do not dispute that the ordinances are governmental restrictions on speech otherwise protected by the First Amendment.  Accordingly, "[i]n evaluating [governmental] restrictions on speech, different standards apply depending on the type of forum involved." *Hills v. Scottsdale Unified School Dist. No. 48*, 329 F.3d 1044, 1048-49 (9th Cir. 2003) (citing *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983)).  "'Public fora have achieved a special status in our law; the government must bear an extraordinarily heavy burden to regulate speech in such locales.'" *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009) (quoting *NAACP v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984)).  Moreover, "[t]raditional public fora gain even more importance when they are host to core First Amendment speech." *Id.* (citing *Hague v. Comm. for Indus. Organization*, 307 U.S. 496, 515-16 (1939).  "[S]idewalks, streets, and parks generally 'are considered, without more, to be public forums.'" *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1099 (9th Cir. 2003) (quoting *United States v. Grace*, 461 U.S. 171, 177 (1983)).  Indeed, sidewalks (along with streets and parks) are "'public places historically associated with the free exercise of expressive activities,'" *Food Not Bombs*, 450 F.3d at 1035 (quoting *Grace*, 461 U.S. at 177), and they are "distinct forums for speech." *Seattle Affiliate of Oct. 22nd Coalition to Stop Police Brutality, Repression and Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 796 (9th Cir. 2008).  Defendants concede that notwithstanding their unique attributes as compared to other public sidewalks generally, the Bridge's sidewalks are public fora for the purposes of First Amendment analysis. Docket No. 116 (Hearing Transcript) at 18:18-21.

As a primary matter defendants appear to attempt to distinguish *Food Not Bombs* and *Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009)*,* by suggesting a distinction in kind, for First Amendment purposes, between sidewalks on the one hand and "public spaces" on the other hand. Hearing Transcript at 30:1-12; Docket No. 90 (District's Opposition) at 12.  In *Food Not Bombs*, the Ninth Circuit validated a city ordinance, as it applied to public sidewalks, that required groups of

9

any size to apply for a permit to engage in expressive activity on the streets and sidewalks of the City of Santa Monica.  The permitting ordinance there required that organizers of all groups apply for a permit if the expressive activity "imped[ed], obstruct[ed], impair[ed] or interfer[ed] with the free flow of traffic." *Id.* at 1040 (internal quotation marks omitted).  The court stated that the ordinance "standing alone, [was] *not* narrowly tailored under [Ninth Circuit] precedents . . . because it lack[ed] any specification as to the size of the group covered and contain[ed] no other sufficiently close tie to the government interest in the free flow of traffic." *Id.*  (emphasis added).  However, enforced together with the modifying Instruction, which provided a sufficiently limiting construction by making the speech restrictions applicable only where expressive activity was "'likely to: interfere with the free use of any public way ... or not comply with traffic regulations,'" the Ninth Circuit ultimately upheld the ordinance as it applied to sidewalks. *Id.* at 1039.[3]  Because, however, there was no similar limiting construction on the application of the ordinance to public spaces, the court held that the ordinance as applied to public spaces other than sidewalks was not narrowly tailored to serve the government's interests. *Id.* at 1042.  Thus, the difference in outcome as between the ordinance relating to sidewalks and public places in *Food Not Bombs* turned on the nature of the ordinances in question rather than any distinction between sidewalks and public places as public fora with respect to First Amendment analysis.

Similarly in *Berger*, the Ninth Circuit affirmed the district court's invalidation of several ordinances that sought to limit speech by mandating, inter alia, permitting requirements in the Seattle Center, which occupies 80 acres of public space. 569 F.3d at 1035.  The ordinances there centered on the use of the Center's park areas, and accordingly, the opinion centered on the constitutionality of restricting speech in a public park.  Nowhere in the opinion, however, does the court distinguish between public parks and sidewalks when considering the application of a permitting requirement to a single speaker in a public forum.  Rather, the court states in clear terms that, "[t]his circuit has repeatedly affirmed the principle that an advance notification requirement applicable to speech in a public forum must be limited to larger groups." *Id.* at 1058.

1    Defendant points to no other authority that suggests that sidewalks, even those that line busy

2    bridge highways, are to be treated any differently as a matter of First Amendment analysis.

3    Moreover, the District acknowledges that the Bridge's sidewalks are public fora for the purposes of

4    First Amendment analysis, and "[t]he government bears the burden of justifying the regulation of

5    expressive activity in a public forum." *Id.* at 1035.

6    In a public forum, the government may establish time, place and manner restrictions on

7    speech activity so long as the restrictions are content-neutral, narrowly tailored to achieve a

8    substantial government interest and leave open ample alternatives for communication. *Ward v. Rock*

9    *Against Racism*, 491 U.S. 781, 791 (1989).  "The failure to satisfy any single prong of this test

10   invalidates the requirement." *Grossman v. City of Portland*, 33 F.3d 1200, 1205 (9th Cir. 1994).

11   Once challenged, the government bears the burden of showing that the ordinances are narrowly

12   tailored to achieve its substantial interests. *See Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863

13   (9th Cir. 2001).  For the purposes of plaintiff Blome's facial challenge, the parties do not dispute that

14   the regulations on speech found in the Master Ordinance are content-neutral.  Nor do the parties

15   dispute that the District has a substantial interest in: (1) promoting traffic safety on the Bridge

16   roadway and on its sidewalks; (2) maintaining the free flow of traffic both on the roadway and on

17   the sidewalks; and (3) maintaining security on the Bridge. *See* Docket No. 71 (District's Motion) at

18   15.  The parties' dispute centers on whether, as applied to individuals and small groups, the five

19   provisions of the Master Ordinance here in question, are narrowly tailored to achieve the

20   government's stated interests and whether the restrictions, as applied to individuals and small

21   groups, leave open ample alternatives for communication.  It is in this light that the court addresses

22   the five challenged ordinances.

23            1.    Permitting Ordinances - F.4(a) and F.5(a)

24   Sections F.4(a) and F.5(a) of the Master Ordinance are permitting requirements applicable to

25   every individual speaker and every group, regardless of size, that seeks to use signs, props and

26   musical instruments to engage in expressive activity on the Bridge's sidewalks.  Taken together,

27   sections F.4(a) and  F.5(a) impose a minimum four-day permitting requirement on any expressive

28

11

activity on the Bridges sidewalks, even as to one individual, as long as any use of a sign, prop or musical instrument is involved.  Individual speakers and groups of up to fifty persons do not need a permit to engage in expressive activity so long as there are no signs, props or musical instruments involved. Witt Decl., Exh. K (Ordinance Amending Master Ordinance 2009, § F.4(a)) at 8.  The Bridge manager concedes, however, that "on most occasions [a small group of fifty engaged in expressive activity on the Bridge without the benefit of signs, etc., ] is probably on most occasions going to just blend into the landscape." Docket No. 80-2 (Krishnan Decl.), Exh. 1 (Witt Depo.) at 61:15-17.  Certainly then, without the benefit of a sign, etc., a single speaker or a small group of three or four persons, for example, is not likely to effectively engage in expressive activity on the Bridge's sidewalks.  For single speakers and small groups then, the two permitting requirements function together to eliminate spontaneous speech on the Bridge's sidewalks.

"A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality." *Berger*, 569 F.3d at 1037 (citations and internal quotation marks omitted).  "This heavy presumption is justified by the fact that prior restraints on speech . . . are the most serious and the least tolerable infringement on First Amendment rights." *Long Beach Area Peace Network*, 574 F.3d at 1023 (citations and internal quotation marks omitted). Notwithstanding the Ninth Circuit's pronouncement that, "we and almost every other circuit to have considered the issue have refused to uphold registration requirements that apply to individual speakers or small groups in a public forum," *Berger*, 569 F.3d at 1039, the District argues that applying the permitting ordinances to individual speakers and small groups is necessary to achieve its goals, even in light of the fact that as a practical matter, the two ordinances taken together eliminate effective spontaneous speech.  Indeed:

> Advance notice or permitting requirements do, by their very nature, foreclose spontaneous expression. Consequently, in any particular forum, true spontaneous expression and the application of an advance notice requirement are mutually exclusive. Groups *may* be able to engage in expressive conduct after the notice period has expired, but the change in timing will alter the potential impact of their speech.  For speech that is truly time sensitive, the precise spontaneous moment will be lost. *Food Not Bombs*, 450 F.3d at 1046 (emphasis in original) (internal citations omitted).

**United States District Court**
For the Northern District of California

1   This is exemplified by plaintiff Turner's case, in which Turner sought to respond to unfolding events

2   surrounding the Torch Relay but was unable to legally engage in effective spontaneous speech on

3   the Bridge.  The only way that Turner could have legally engaged in his activities with his sign

4   would have been to wait at least four business days after the Torch Relay had long left San Francisco

5   and after his opportunity to communicate his political speech on the Bridge had disappeared.

6        The District contends, however, that "even one sign can and does cause distraction to

7   motorists" on the Bridge. District's Motion at 18:9.  Accordingly, the District argues that it needs the

8   prior notice, even as to one solitary speaker with a sign conforming to the Master Ordinance's

9   signage limitations,[4] because the District requires four business days to assemble the additional

10  security staff allegedly necessary to address any problems that may arise as a result of a single

11  speaker with a legal sign.  The District contends that without the ability to apply the permitting

12  requirements to all speakers, the "District might find itself without adequate staff to ensure safety."

13  District's Motion at 18:15-16.

14       The District's argument here is unavailing for several reasons.  Firstly, even though "[a]

15  narrowly-tailored permitting regulation need not be the least restrictive means of furthering a

16  locality's asserted interests[, t]he regulation may not . . . burden substantially more speech than

17  necessary to achieve a scheme's important goals." *Food Not Bombs*, 450 F.3d at 1038 (citing *United*

18  *States v. Baugh*, 187 F.3d 1037, 1043 (9th Cir.1999)). "[T]he requirement of narrow tailoring is

19  satisfied 'so long as the ... regulation promotes a substantial government interest that would be

20  achieved less effectively absent the regulation.'" *Id.* (internal citations and quotation marks omitted).

21  Here, in regard to single speakers and small groups, the District already has in place a structure to

22  deal with potential problems that may arise.  For example, the District maintains an ever-present

23  security staff whose daily job is to address problems on the sidewalks. JSUF ¶ 6.  The District

24  concedes that in most cases, this security personnel are able to respond to problem spots within five

25  minutes.  *Id.* ¶10.  The District also maintains surveillance cameras to monitor the sidewalks and a

26  public address system that permits District staff to communicate directly with persons on the Bridge.

27  *Id.* ¶¶ 8, 11.  In addition, the CHP maintains a daily presence at the Bridge and frequently deploys

28

13

United States District Court

For the Northern District of California

additional officers, including a regular bicycle patrol on weekends. *Id.* ¶¶ 12,13.  Moreover, the

District concedes that, "for small events like a single person holding a sign or flag, we probably

wouldn't have any extra officers beyond those already on duty." *Id.* ¶ 39.  Accordingly, the evidence

shows that the District has the capacity to address any problems that may arise from a single speaker

or small group with a sign absent the application of its burdensome permitting ordinances to single

speakers and small groups.  For staffing purposes then, it is unclear exactly why the District needs

four days advanced notice that a single speaker intends to bring a sign that conforms to the Bridge's

own sign regulation.  The Bridge's daily security practice appears sufficient to allow the District to

readily address any increased danger without placing such a significant burden on spontaneous

speech.

Moreover, other regulations within the Master Ordinance present less restrictive means of

dealing with the dangers that a single speaker with a sign or a small group with a few signs allegedly

engenders.  For example, section F.8(a) addresses dangerous conduct by requiring persons engaged

in expressive activity to walk "in a safe and orderly manner and remain on the Bridge Sidewalks at

all times," and by prohibiting the holding of  "any object over any portion of the vehicular roadway

or over the railing of the [sidewalks]." Witt Decl., Exh. K (Ordinance Amending Master Ordinance

2009, § F.8(a)) at 11. This ordinance directly addresses the District's concern that a single speaker

with an unpermitted sign might wave the sign in the roadway, causing a traffic hazard.  Section F.7

generally sets forth other mandates on permissible Bridge behavior that readily address the District's

concerns vis-a-vis a single speaker or small group with a sign.  Witt Decl., Exh. K Ordinance

Amending Master Ordinance 2009, § F.7) at10-11.  For example, subsection F.7(b) states:

> No person may engage in any activity that willfully disrupts or obstructs vehicular or
> vessel traffic on or near District Property or willfully interferes with pedestrian or
> bicycle traffic on District Property, including but not limited to sidewalks . . .  *Id.* at
> 11.

Accordingly, the District presently has in place the means to address problems that may arise due to

a single speaker with a sign without so heavily burdening spontaneous speech.

Secondly, the District has not presented evidence that shows beyond a purely speculative

level that a single person with a sign, or a group of four with two signs, for example, is likely to

14

United States District Court

For the Northern District of California

1   cause a significant disruption on the Bridge.[5] *Edwards*, 262 F.3d at 863 (citing *Bay Area Peace Navy*

2   *v. United States*, 914 F.2d 1224, 1227 (9th Cir. 1990)  ("[T]he First Amendment demands that

3   municipalities provide tangible evidence that speech restrictive regulations are necessary to advance

4   the preferred interest in public safety." (internal quotation marks omitted)).  The District's

5   arguments are largely couched in terms of possibilities rather than likelihoods as is implicated by the

6   lack of empirical evidence regarding single speakers engaged in expressive activity on the Bridge.

7   *Id.* at 864 (invalidating a city ordinance proscribing the use of picket signs in part because "the

8   record reveal[ed] little factual support for the City's claim that [the ordinance was] necessary to

9   advance [the city's goals].")

10          For example, at the hearing, in response to the court's query as to how advanced notice of a

11  group of ten with a sign consistent with the Master Ordinance's limits assists the District in

12  achieving its safety and management goals, defendant's counsel responded that "with ten people we

13  *may or may not* need extra resources with a sign, but we want to make sure that there was someone

14  available to monitor that group, even if it's ten people with a sign." Hearing Transcript at 15:13-16

15  (emphasis added).  The Ninth Circuit has stated, however, that:

16          "'May' is a term of nearly infinite elasticity, given the unbounded variety of
            human events. While many things are quite unlikely to happen, almost anything
17          physically possible 'may' happen. . .The term 'may,' in other words, simply takes
            in too many circumstances that do not, as matters actually turn out, implicate the
18          governmental interests justifying the permitting requirement." *Food Not Bombs*,
            450 F.3d at 1041.

19  Moreover, the tangible evidence that does exist regarding an individual engaged in spontaneous

20  expressive activity using a sign, prop or musical instrument on the Bridge suggests no significantly

21  increased hazard.  After the events of September 11, 2001, the District allowed Jeffrey Orth, without

22  a permit, to walk across the Bridge holding an approximately 11" x 17" American flag on a daily

23  basis through sometime in 2003. JSUF ¶¶ 41-42.  The District presents no evidence that this

24  expressive activity caused serious problems on the Bridge or presented any particular sidewalk

25  hazard.  The Bridge manager testifies that, "there were some traffic implications from time to time

26  as people would stop and wave and honk and show their support," Krishna Decl., Witt Depo. at

27

28

                                                    15

**United States District Court**

For the Northern District of California

1    130:10-12, but these consequences that do not suggest a serious problem that justifies applying the

2    permitting requirement to individuals.

3         Insofar as the District alludes to the threat of terrorism as justifying the application of the

4    permitting requirements to single speakers and small groups, the District's general policies with

5    regard to objects unrelated to expressive activity undermines the District's arguments.  The District

6    concedes that it imposes no permitting requirements upon individuals or groups who bring any

7    number of items onto the Bridge.  Neither backpacks, shopping trolleys, strollers, walking sticks,

8    surfboards nor any number of other objects are policed in the same manner that a sign declaring a

9    "political, religious, philosophical, or ideological opinion, view, or message that likely would be

10   understood by those who see or hear the speech, communication, or conduct to be such an opinion,

11   view, or message" is policed.[6] *See id.* at 24-26.  Yet, any TSA agent is certain to testify that these

12   District-approved, unpermitted items pose serious security threats.  It is curious then that the District

13   perceives an individual engaging in expressive activity with an appropriately-sized sign as enough of

14   a threat so as to justify the denial of the basic First Amendment right to spontaneous speech in a

15   public forum, yet at least as far at the Master Ordinance reflects, sees little danger in an individual

16   with a backpack of unknown contents.[7]

17        The court also finds unavailing the District's argument that the permitting requirements are

18   justifiably applicable to individuals and small groups because signs have the potential to blow into

19   the roadway.  Although this appears a legitimate concern, the District presents no evidence that

20   requiring a single person to apply four days in advance for a permit to carry a sign helps to mitigate

21   this danger.  As discussed above, the District is capable of monitoring individuals on a daily basis

22   without need for additional staff.  Secondly, if the winds on the Bridge are as unpredictable as the

23   District suggests, it is unclear exactly what four days' advanced knowledge that the speaker will be

24   on the Bridge with a sign will accomplish.  The District does not suggest that it actually increases

25   the number of staff who stand ready to retrieve the errant sign from the roadway, so presumably any

26   increase in security staff would go towards monitoring the single speaker's use of the sign to prevent

27   it blowing away.  As stated above, in fact the District is not likely to increase its staff in response to

28

16

1   an single speaker with a sign. JSUF ¶ 39.  In light of this, the permitting requirements appear to do

2   little to address the wind problem.

3           The District also argues that the danger of driver distraction, even from one sign, renders the

4   permitting ordinances constitutionally sound.  Once again, the District neither explains how

5   advanced notice of a single speaker with a sign or a small group with signs helps to address the

6   problem of driver distraction nor presents evidence that a single speaker with a sign, prop or musical

7   instrument significantly increases driver distraction.[8]  For example, the District does not assert that

8   it changes the lane configuration in response to a single speaker with a sign, and as the Bridge

9   manager testifies, probably does not summon additional staff. *Id.*  The District does not announce

10   that expressive activity with signs is set to occur so from the uninformed driver's perspective, a

11   permitted sign is just as distracting as an unpermitted sign.  It is entirely unclear then how the

12   District's advanced knowledge that an individual or small group will engage in expressive activity

13   using a sign helps to mitigate the danger of driver distraction or accomplishes anything more than to

14   allow the District "to monitor that group." Hearing Transcript at 15:13-16.

15           The District also argues in its briefing that four business days are necessary to allow Bridge

16   officials to secure additional security staffing to address any problems that may arise as a result of

17   expressive activity of an individual speaker with a sign or a small group of protesters with signs.

18   Defendant's evidence suggests otherwise.  As reflected above, there is a significant daily law

19   enforcement presence on the Bridge, ready to address any problem that arises.  The District

20   concedes that in reality, the District's security personnel can respond to problems on the Bridge,

21   "faster than five minutes in most cases." Krishna Decl., Witt Depo. at 31:8-10.  The District argues,

22   nonetheless, that individuals and small groups are "far more disruptive of the daily activity" on the

23   Bridge and presumably require a greater security presence. District's Opposition at 13.  Yet, the

24   District presents no evidence of this assertion.

25           Nor has the District produced evidence that connects unpermitted expressive activity by

26   individuals or small groups using signs with increased traffic delays on the Bridge. While it is not

27   unreasonable to suggest that this is the case, the District does not attempt to show causation in its

28

                                                    17

proffered evidence of traffic snarls.  District officials speculate that individuals with signs consistent with the ordinance's sign limits would create a problem, but presumably so do permitted signs as well as a host of other conditions and events occurring both on the Bridge and in San Francisco and Marin County.  Defendants proffer expert evidence of traffic counts and traffic issues on the Bridge, yet these experts present no comparative or empirical evidence connecting individual or small group unpermitted use of signs consistent with the Master Ordinance's sign and significantly increased traffic hazards.  For example, the District proffers records of an incident in which three individuals climbed the Bridge and unfurled a large banner.  Unsurprisingly, this resulted in a major traffic jam. Plaintiffs, however, do not seek to engage in this kind of patently disruptive behavior.  Indeed, it is not clear how the possession of a permit prevents or deters this kind of conduct, and the District fails to explain this.  Accordingly, this evidence does not address the issue here, namely whether a single speaker holding a sign or a small group with a few signs that are consistent with the District's sign limitations would inevitably lead to traffic problems on the Bridge.  The District's evidence does not speak to this issue.

With regard to musical instruments, the ordinance also singles out expressive activity for regulation even though non-expressive activity is likely yo be just as distracting.  As written, the ordinance permits an individual to bring a musical instrument on the Bridge to play for pleasure, but prohibits one whose intent was to play as a means of engaging in expressive activity.  From an objective standpoint, however, the capacity for distraction remains the same as between the two players.  Thus, the District appears to disfavor "expressive" playing of musical instruments even as it welcomes playing for non-expressive purposes.

Ultimately, defendants are unable to meet their burden of showing some nexus between the permitting requirements as applied to small groups and individuals and the governmental interests. *See Food Not Bombs*, 450 F.3d at 1039.  Even assuming that defendants' evidence presented some nexus between its permitting requirement as applied to individuals and small groups and its interest in traffic safety, the District presents no evidence justifying its four-business day advanced notice

policy.  District officials concede that four days are not necessary to address any alleged increased

safety or security concerns raised by a single-speaker or a small group with a sign.

        Moreover, the District's permitting ordinances do not leave open ample alternatives for

spontaneous communication with the intended audience on the Bridge.  Taken together, the two

ordinances completely prevent a single-speaker from spontaneously expressing his views with a sign

on the Bridge.  Defendants contend that spontaneous speech is allowed as long as the speaker does

not use a sign.  However, defendants concede that without the benefit of a sign, a single speaker's

voice would be lost amidst the multitude on the Bridge's sidewalks and amidst the noisy Bridge

traffic.  Defendants suggest that spontaneous speech is available in other parts of the City of San

Francisco, and suggest that individuals and small groups who want to engage in spontaneous speech

using a sign should simply go elsewhere.[9]  Defendants concede, however, that the Golden Gate

Bridge is a unique locale that commands a worldwide audience.[10]  The intended audience on the

Bridge, then, is not easily duplicated, even in a major American city such as San Francisco.  And,

"[i]f an ordinance effectively prevents a speaker from reaching his intended audience, it fails to

leave open ample alternative means for communication." *Edwards*, 262 F.3d at 866 (citing *Heffron*

*v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 654 (1981).

        The court is mindful of the notion "that the First Amendment does not guarantee the right to

communicate one's views at all times and places or in any manner that may be desired." *Int'l Soc'y*

*for Krishna Consciousness, Inc.*, 452 U.S. at 647.  "However, an alternative mode of communication

may be constitutionally inadequate if the speaker's ability to communicate effectively is threatened."

*Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005) (internal citations and quotation

marks omitted).  In *Menotti*, the Ninth Circuit considered an emergency ordinance restricting speech,

implemented in the wake of the first World Trade Organization (WTO) conference held in Seattle,

WA.  The court concluded that the ordinance at issue provided protestors with ample alternatives to

communicate their message because although "protestors could not deliver their message directly to

[the WTO] delegates, . . . protestors were able to demonstrate and express their views immediately

outside the restricted zone, including areas directly across the street from the [WTO venues]." *Id.*

19

United States District Court

For the Northern District of California

Additionally, "[t]he protestors could reasonably expect their protest to be visible and audible to delegates, even if not as proximate as the protestors might have liked." *Id.*  In this case, without the benefit of appropriately sized signs, props or musical instruments, single speakers and small groups' ability to engage effectively in spontaneous speech on the Bridge "is threatened." *Id.* (internal citations and quotation marks omitted).

Taken in the light most favorable to the defendant, defendant's evidence does not connect its stated governmental interests with the prior restraint on the spontaneous speech of individuals and small groups, and the District has failed to meet its burden to show that as applied to individuals and small groups, sections F.4(a) and F.5(a) are narrowly tailored.  "A narrowly tailored permit requirement must maintain a close relationship between the size of the event and its likelihood of implicating government interests." *Food Not Bombs* at 1040.  The District has not provided evidence that a single speaker with a sign, prop or musical instrument implicates the government's interests in public safety so much so as to justify the usual measure of applying a prior registration regulation to an individual or small group.  Indeed:

> Without a provision limiting the permitting requirements to larger groups, or some other provision tailoring the regulation to events that *realistically present serious* traffic, safety, and competing use concerns, significantly beyond those presented on a daily basis by ordinary use of the streets and sidewalks, a permitting ordinance is insufficiently narrowly tailored to withstand time, place, and manner scrutiny. *Food Not Bombs*, 450 F.3d at 1039. (emphasis added)

The District has not shown that an individual or a small group with a sign amidst the multitude on the Bridge's sidewalks realistically presents a serious threat to traffic and safety on the Bridge. Because here the District presents no evidence, empirical or otherwise, suggesting that individuals and small groups with signs are likely to present a significant threat to Bridge safety and order, the government does not meets it burden of showing that sections F.4(a) and F.5(a) are narrowly tailored.  Because the ordinances preclude any peaceful and law-abiding individual or small group from engaging in spontaneous expressive activity with a sign on the Bridge, they "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799.  Thus, the District's permitting regime is over broad because it reaches a substantial number of impermissible applications. Nor does a case-by-case analysis save the ordinances here

20

because as written and enforced together, the District's permitting requirements mean that *no* individual speaker may spontaneously express his or her views using a permissible sign on the Bridge. *New York v. Ferber*, 458 U.S. 747, 774 (1982) (finding that a law is not substantially overbroad when a case-by-case analysis can cure overbreadth.)   In addition, the District's permitting ordinances effectively prevent any ample alternative for spontaneous speech on the Bridge because, "they effectively prevent a message from reaching the intended audience." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 607 F.3d 1178, 1192 (9th Cir. 2010). The ordinances significantly contravene "[t]he strong interest in protecting the opportunity for spontaneous expression in public fora with respect to individuals or small groups." *Food Not Bombs*, 450 F.3d at 1046.

### 2.   Sign on Handles - Section F.8(c)

Section F.8(c) states in relevant part: "All signs and props must be handheld; they may not be attached or mounted to poles, sticks, or other devices that are used to hold the signs or props."  The District argues that even one sign, etc., mounted on a stick or with handle (hereinafter "picket signs") poses a danger of additional use as a weapon, causes greater driver distraction and is vulnerable to the unique weather conditions on the Bridge.

With regard to the threat of violence allegedly engendered in picket signs, defendants argue that *Edwards v. City of Coeur d'Alene* does not apply here because unlike in *Edwards*, there is evidence that picket signs have previously been used as weapons on the Bridge. 262 F.3d 856.  In *Edwards*, the plaintiff sought to enjoin the enforcement of an ordinance that banned the use of supports attached to signs during parades and public assemblies in the city's streets. *Id.*  The Ninth Circuit held that the ordinance was not narrowly tailored to advance the government's interest in "safeguarding its citizens against violence" in part because the city did not present empirical evidence supporting its claim that the ordinance was necessary to advance its goal of preventing violence. *Id.* at 863.  Here, as in *Edwards*, there is little factual support for the District's contention. Defendants refer to only one incident that occurred over twenty years ago to bolster its finding that a single speaker with a picket sign or a small group holding a few picket signs pose a particular threat

of violence. *See* Docket No. 76 (Veit Decl.), Exh. 4 (M. Locati Depo.) at 63:8-16.[11]  A single, twenty

year-old incident, of which none of the witnesses has personal knowledge, is not sufficient to satisfy

the government's burden of showing a nexus between its asserted governmental interests and its

regulations on protected speech.

Neither does the District proffer evidence suggesting that even one picket sign carried by a

single-speaker or small group poses a particular threat in terms of driver distraction, apart from

proffering expert testimony that generally signs by the roadway may distract drivers.  Defendants

argue that even a single speaker with a picket sign is especially dangerous on the Bridge because the

individual will wave the picket sign in order to gain the attention of drivers.  As discussed above,

however, there are other provisions of the Master Ordinance that address the potential for sign

holder misconduct.   Indeed, it is entirely speculative that one picket sign significantly increases the

danger of driver distraction so much so as to justify the District's attempts here to significantly limit

speech on the Bridge.

Defendants cite *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998), for the proposition

that the government may regulate picket signs when they pose a hazard in traffic.  There is, however,

a significant difference between the ordinance at issue in *Foti* and the ordinance at issue here.  In

*Foti*, the city ordinance sought to regulate the use of picket signs by limiting the size and number of

picket signs, not by completely banning all picket signs.  The plaintiffs in *Foti* were able to engage

in spontaneous speech using picket signs provided that the signs were consistent with the City's size

restrictions.[12]   Here, plaintiff Blome does not dispute the District's restrictions on sign size, but

rather seeks to be able to use a picket sign to engage in individual and small group spontaneous

protest.  Moreover, as mentioned above, defendants concede that without the benefit of a sign, a

single speaker's voice would be easily lost in the crowded and noisy Bridge sidewalks.

Defendants also argue that the unique and unpredictable weather on the Bridge mandates the

prohibition of picket signs.  Specifically, defendants reference a concern for the unpredictable wind

patterns on the Bridge and the danger that a picket sign might blow into traffic.  The record,

however, contains little factual support for the District's argument that the wind on the Bridge could

United States District Court

For the Northern District of California

render an individual's use of a even a solitary picket sign a significant danger.  The district argues that picket signs are likely to blow into the roadway and cause accidents, but so are umbrellas, for example, yet the District does not prohibit umbrellas on the Bridge simply because of the hazard they certainly present of both blowing onto the roadway and/or injuring other pedestrians or bicyclists.  In choosing to regulate signs on handles, the District presents no comparative evidence which shows why a picket sign is more likely to pose this threat, thus warranting a complete ban, versus all the other unregulated objects that may readily be brought onto the Bridge by any member of the public.  Hats, shopping bags, umbrellas, scarves, pieces of cardboard, etc. are all similarly vulnerable to the unpredictable wind on the Bridge, able to blow into the roadway and wreak havoc, yet the District has only singled out picket signs for prohibition.[13]

Moreover, the ban significantly limits an individual speaker's ability to address her audience. In the context of the sidewalks of the Bridge, which are often heavily populated with pedestrians and bicycle riders, a single speaker's message may be easily drowned out.  Indeed, a single voice would likely go unheard "above the din," and "hand-held signs [would be] easily swallowed up by the crowd." *Edwards*, 262 F.3d at 866-867.  Without the benefit of a picket sign, the perspective of the single speaker on the Bridge's sidewalks is likely to be all but lost, and the District does not show that it gains any significant benefit in so limiting individual speech in this manner.  Indeed, "the [o]rdinance's total ban on sign supports has an undeniable impact on the manner in which a signholder communicates with the public" on the Bridge. *Edwards*, 262 F.3d at 865.  Accordingly, the District's absolute ban on picket signs is not narrowly tailored to achieve the government's stated interests in safety.  As applied to individual protesters and small groups of protesters, the ordinance restricts a significantly larger amount of speech activity than necessary to achieve the District's goals, and so it is not well-fitted to address the government's stated interests in safety and order.

3.   Sound Amplification - Section F.8(b)

Section F.8(b) provides: "No person [engaged in expressive activity] may carry or use bull horns or sound amplification devices on Bridge Sidewalks."  Defendants argue that the purpose of

**United States District Court**
For the Northern District of California

1   this ordinance is to avoid driver distraction and to promote safety on the Bridge's sidewalks.

2   Specifically, defendants contend that the ban on even one individual's use of a bull horn or sound

3   amplification device is necessary because the sound level generated is likely to drown out the

4   Bridge's own loudspeaker system.  According to defendants, in times of emergency, even a single

5   bull horn or sound amplification device in use would drown out law enforcement's attempts to

6   secure the Bridge.  The District, however, presents no actual evidence that one bull horn or sound

7   amplification device would in fact drown out the multiple speakers and the emergency telephones

8   that the District maintains for communication with the public on the Bridge.  Nor does the District

9   present evidence showing a likelihood that a single bull horn or sound amplification device would

10  result in a significant increase in driver distraction.

11          Moreover, not all sound amplification is forbidden on the Bridge.  The District concedes that

12  it places no restrictions, beyond general state laws regarding disturbing the peace, on sound

13  amplification devices *not* used for expressive activity. JSUF ¶ 34.  Yet, the District offers no

14  rationale for treating expressive activity and non-expressive activity differently in this respect.

15  Presumably, the permissible non-expressive sound amplification poses the same threat of allegedly

16  drowning out the District's speakers and P.A. system.  Additionally, members of the public who do

17  not intend to do so for expressive purposes may also play radios, for example, as long as the sound is

18  kept within municipal limits on noise and so long as they do not intend to do so as part of an

19  expressive activity.  Krishna Decl., Witt Depo. at 26:9-16, 158:9-23.  The District does not explain

20  the difference in treatment or why similar restrictions on bull horns and sound amplification with

21  respect to expressive activity is not acceptable as a less restrictive means of addressing expressive

22  activity. *Foti*, 146 F.3d at 642-643 ("Obvious, less burdensome means for achieving the City's aims

23  are readily and currently available by employing traditional legal methods.")  Accordingly, the court

24  concludes that this ordinance in not narrowly tailored to achieve the government interests.

25          4.      Weekend Hours - Section I.F.6(d)

26          Section F.6(d) provides in relevant part: "Permits for Expressive Activity on the Bridge

27  Sidewalks will not be issued (1) when the Bridge Sidewalks are closed to pedestrians; (2) on

28                                                      24

United States District Court

For the Northern District of California

weekdays from 6:00 a.m. - 10:00 a.m. and 2:00 p.m. - 7:00 p.m.; or (3) on weekends and holidays from 2:00 p.m. to 11:59 p.m." Plaintiff Blome only contests the constitutionality of the Bridge's weekend restriction on speech after 2 p.m. She argues that the cutoff on Sundays precludes religiously-inclined protesters, who attend religious services on Sunday morning, from participating in expressive activity on the Bridge.

Defendants argue that the ordinance is designed to promote traffic safety on the Bridge during peak traffic periods. According to the District, increased traffic during those hours heightens the potential for traffic delays and driver distraction, thus making necessary the District's complete prohibition on expressive activity after 2:00 p.m. on Saturdays and Sundays. To that end, defendant proffers evidence that on Friday, June 26, 2009, the District allowed the group, Bay Area for Iran, to engage in expressive activity on the Bridge after 2:00 p.m. Witt Decl. ¶ 43; Exh. E (Permit Agreement). Allegedly, "the incident created an immediate and significant traffic back-up that congested rush hour traffic for hours." *Id.* at ¶ 43. Given, however, that this event took place on a Friday and involved up to 200 people, the evidence does not speak to the effect that expressive activity involving individual speakers or small groups has on traffic during the hours in question on weekends. For example, defendants evidence does not show that individual or small group expressive activity after 2:00 p.m. on weekends leads to a significant increase in traffic congestion, in collisions or other accidents. Rather, one of defendants' experts appears to suggest that the danger of accidents might actually *decrease* during times of increased traffic since drivers are going more slowly and are less likely to become involved in accidents. Docket No. 92 (Manolius Decl.), Exh. 1 (Ruzak Depo.) at 44:22-45:14.[14] Ultimately, the burden rests with the District, but the District has not produced evidence showing the nexus between any expressive activity by an individual or a small group and its total prohibition on expressive activity on the Bridge's sidewalks after 2:00 p.m. on weekends. Thus the District's ordinance banning all expressive activity by individuals and small groups on weekends after 2:00 p.m. is not narrowly tailored to achieve its interest in traffic safety.

　　　　　5.　　Summary

25

United States District Court

For the Northern District of California

1    Summary judgment is GRANTED in favor of plaintiff Blome as to all five of the challenged

2    ordinances, as they apply to individuals and small groups.

3    II.    The District's Motion

4    The court next considers the District's Motion.  Given the court's conclusions as to plaintiff

5    Blome's motion, summary judgment as to the constitutionality of the five ordinances in question is

6    DENIED.

7    A.    Standing - Plaintiff Turner

8    Defendant argues that plaintiff Turner lacks standing to bring a facial challenge against the

9    District because he has not demonstrated at the Bridge since April 9, 2008, and he has stated that he

10   has "no specific plans" to demonstrate at the Bridge in the future. Veit Decl., Exh. 13 at 49:3-9.

11   Given the court's conclusion that plaintiff Blome has standing to bring a facial challenge, the court

12   finds it unnecessary to reach Turner's standing.

13   B.    Turner's As-Applied Challenge

14   Defendants argue that Turner's as-applied challenge is invalid because the District's

15   ordinances are constitutional.  Because the court concludes above that the District's permitting

16   ordinances are facially unconstitutional as applied to individuals engaged in speech on the Bridge's

17   sidewalks, summary judgment as to Turner's as-applied challenge is DENIED.

18   C.    Summary

19   Summary judgment as to the constitutionality of the five ordinances in question is DENIED.

20   Summary judgment as to plaintiff Turner's standing to bring a claim for declaratory relief is

21   DENIED.  Summary judgment as to Turner's standing to bring an as-applied challenge is DENIED.

22   III.   CHP Defendants' Motion

23   A.    Qualified Immunity

24   Turner seeks to hold the CHP officers personally liable for violations of his First and Fourth

25   amendment rights, however CHP defendants argue that they are entitled to qualified immunity.[15]  "A

26   finding of qualified immunity depends on a two-part inquiry by the court." *Peng v. Mei Chin*

27   *Penghu*, 335 F.3d 970, 976 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The

28

26

United States District Court
For the Northern District of California

1    court must determine whether the facts alleged, "'taken in the light most favorable to the party

2    asserting the injury,'" show the violation of a constitutional right, and whether the right was clearly

3    established at the time of the violation. *Id.* (quoting *Saucier v. Katz*, 533 U.S. at 201); *see*

4    *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007) ("Defendants are entitled to such

5    relief only if the facts alleged and evidence submitted . . . show that their conduct did not violate a

6    federal right; or, if it did, the scope of that right was not clearly established at the time."). Courts

7    may independently determine the order in which to consider each prong of the qualified immunity

8    test. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818 (2009).

9          Citing *Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir. 1994), CHP defendants argue

10   that they are entitled to qualified immunity from these claims because in seizing Turner's sign they

11   were merely enforcing the Master Ordinance as duly promulgated by the District. In *Grossman*, the

12   Ninth Circuit considered the constitutionality of a city ordinance that required a permit for public

13   gatherings in a public park. Although finding that the ordinance was unconstitutional for lack of

14   narrow tailoring, the panel concluded that the officers who enforced the ordinance against the

15   plaintiff were entitled to qualified immunity.

16         This ordinance, which had been duly promulgated by the city council, was not so
      obviously unconstitutional as to require a reasonable officer to refuse to enforce

17         it. City councils have authority, consistent with the First Amendment, to adopt
      certain time, place, and manner restrictions regulating the use of public parks by

18         groups, including in some circumstances narrowly-tailored permit requirements.
      Thus, [the officer] was reasonably entitled to rely on the city council's judgment

19         that it was lawful to require a group desiring to use the park to obtain a permit. *Id.*
      at 1210.

20

21         Similarly, in *Way v. County of Ventura*, 445 F.3d 1157 (9th Cir. 2006), the Ninth Circuit

22   considered the applicability of qualified immunity in a case where pursuant to a blanket strip search

23   policy, two officers conducted a visual cavity inspection of a female detainee under suspicion of a

24   misdemeanor drug charge. The court determined that the blanket strip search policy was

25   unconstitutional, yet concluded that the officers were entitled to qualified immunity because

26   "reasonable officers . . . could have believed that the [strip search policy] comported with the

27   Constitution." *Id.* at 1164 (Wardlaw, J., concurring).

28

United States District Court

For the Northern District of California

1    Here, the CHP officers seized Turner's sign pursuant to the duly promulgated Master

2  Ordinance.  Although, the court now concludes that the provisions under which the officers seized

3  Turner's sign are unconstitutional, at the time of the incident it was not unreasonable for the CHP

4  officers to believe that the duly enacted ordinances were constitutional and to enforce them

5  accordingly.

6    Plaintiff also alleges that the officers engaged in viewpoint discrimination by seizing

7  Turner's allegedly anti-China sign while permitting several others within the vicinity to wave

8  Chinese flags.  Plaintiff Turner's photographic evidence shows, however, that the persons waving

9  the Chinese flags (as well as an American flag and a flag with the Olympic rings) were not in fact

10  standing on the sidewalk, but were positioned directly above the sidewalk in what appears to be an

11  elevated grassy area. Docket No. 93 (Turner Decl.), Exh. 2 (Photograph).  Apparently, the

12  permitting ordinance applies only to the Bridge's sidewalk, and because the flagholders were not

13  standing on the sidewalk, they were not technically in violation of the Master Ordinance.[16]

14  Moreover, at the hearing, counsel for the plaintiff conceded that the officers made no reference to

15  the content of Turner's sign, simply asking him to put his sign away in his backpack. Hearing

16  Transcript at 67.  Accordingly, the court concludes that there is no genuine issue of material fact

17  here.

18    With respect to Turner's Fourth Amendment claim of unlawful seizure, plaintiff Turner

19  argues that *Menotti*, should direct the outcome. 409 F.3d 1113.  In *Menotti*, the Ninth Circuit

20  considered an emergency ordinance enacted in Seattle during the first WTO conference in 1999.

21  After a spate of violent and destructive protest behavior, the city enacted emergency regulations

22  which set up a limited curfew within a portion of downtown Seattle. *Id.* at 1125.  Several protestors

23  filed suit alleging that the ordinance placed an unconstitutional barrier on speech within the

24  restricted area.  The court ultimately concluded that the ordinance was constitutional, yet considered

25  an individual constitutional claim based on a Seattle officer's seizure of a protest sign within the

26  restricted area. *Id.* at 1151-52.  The plaintiff carried a protest sign into the restricted area in violation

27  of the curfew ordinance.  The court concluded that the officer "had probable cause to arrest [the

28

28

plaintiff] because, by engaging in protest inside the restricted zone without evidence that he was exempt, [the plaintiff] violated [the ordinance.]" *Id.* at 1153.  The officer, however, seized the plaintiff's sign without arresting the plaintiff for the proscribed conduct, namely being the restricted area. *Id.*  The court concluded that the officer committed a constitutional violation by seizing the sign but not arresting the plaintiff for the offense. *Id.* at 1154. ("[W]e hold that a reasonable officer . . . would have understood that his warrantless seizure of [plaintiff's] sign without an arrest and without exigency offended the guarantees of the Fourth Amendment [and] reverse the district court's grant of qualified immunity.").

Here the facts are distinguishable from those in *Menotti*.  In *Menotti*, the proscribed behavior was the plaintiff's presence within the restricted zone.  Thus, the officer could only have reasonably seized the sign incident to an arrest for violating the curfew or in response to exigent circumstances.  In this case, the proscribed behavior in which Turner engaged was the possession of the sign without a permit.  The officers' first response was to advise Turner to put this sign away. JSUF ¶ 146.  Only after Turner refused to put away his sign did the officers take the sign away from him. *Id.*  Thus, the officer's seizure of the sign itself without arresting Turner was reasonable because the seizure directly addressed the proscribed behavior.

Turner also alleges that the CHP officers used excessive force when taking his sign.  With respect to this claim, the court first addresses whether there was a constitutional violation.  "A claim against law enforcement officers for excessive force is analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).  The court must consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," and balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396-97, (internal citations omitted).

Viewing the evidence in the light most favorable to Turner, the defendants' use of force in seizing Turner's banner was reasonable.  The officers first unsuccessfully requested that Turner put

29

United States District Court

For the Northern District of California

1  the sign down and put it away in his backpack before they took it by force. Docket No. 68 (Devine

2  Decl.), Exh. F (Turner Depo.) at 82:21-84:1.  The video evidence reveals no use of excessive force

3  given the circumstances. Devine Decl., Exh C (Video).  Accordingly, there was no constitutional

4  violation here because the officers use of force was reasonable given the circumstances.  Summary

5  judgment as to qualified immunity based on plaintiff's First amendment and Fourth amendment

6  claims is GRANTED in favor of the CHP defendants.

7          B.      11th Amendment Claim

8          CHP defendants argue that the Eleventh Amendment bars plaintiff Blome's claim for

9  injunctive relief against CHP Commissioner Farrow.  The court has already determined that this

10 claim stands given that Blome seeks only prospective relief based on asserted federal constitutional

11 rights. Docket No. 32 (Memorandum and Order Granting Plaintiff's Motion for Leave to Amend

12 Complaint).  Accordingly, summary judgment as to Blome's claim for injunctive relief is DENIED.

13         Defendants also argue that plaintiffs are not entitled to declaratory relief as to the remaining

14 CHP defendants because defendant officers have acted constitutionally.  As discussed above

15 however, the five regulations in question are unconstitutional on their face.  Moreover, the CHP

16 contends that its officers will continue to enforce the current Master Ordinance until otherwise

17 directed.  Accordingly, because plaintiff Blome has standing to raise a claim for declaratory relief

18 and because the CHP defendants will continue to enforce the ordinances, summary judgment is

19 DENIED.

20         C.      14th Amendment Claims

21         As plaintiffs do not dispute defendants' assertion that plaintiff's Fourteenth Amendment

22 claims must be analyzed under the First and Fourth Amendments, summary judgment as to these

23 claims is GRANTED in favor of defendants.

24         D.      State Law Claims

25         Plaintiff brings claims based on Art. 1, §§ 2, 13 of the California Constitution, Cal. Civ.

26 Code § 52.1(b) and tort-based false imprisonment.

27              1.      Art.I, Section 2 - Liberty of Speech

28

1      "Under [both the federal and state constitutions] . . . , "[p]ermissible restrictions on

2  expression in public fora must be content-neutral, be narrowly tailored to serve an important

3  government interest, and leave open ample alternative channels for the communication of the

4  message." *Kuba v. 1-A Agr. Ass'n*,  387 F.3d 850, 856 (9th Cir. 2004) (quoting *Galvin v. Hay*, 374

5  F.3d 739, 746 (9th Cir. 2004)).  Given the court's conclusion above that the ordinances in question

6  are not narrowly tailored to achieve the government's substantial interest in safety and order,

7  summary judgment as to plaintiff's state constitutional speech claim is DENIED.

8                      2.      Art. I, Section 3 - Unlawful Seizure/False Imprisonment

9          Art.I, Section 13 states: "The right of the people to be secure in their persons, houses, papers,

10  and effects against unreasonable seizures and searches may not be violated . . ."  "The California

11  Supreme Court has made clear . . .that '[t]he touchstone for all issues under the Fourth Amendment

12  and article I, section 13 of the California Constitution is reasonableness.'" *Sanchez v. County of San*

13  *Diego*, 464 F.3d 916, 928-929 (9th Cir. 2006) (quoting *Ingersoll v. Palmer*, 43 Cal.3d 1321, 1329

14  (1987)).  Thus the standard for state unlawful seizure is coextensive with the federal reasonableness

15  standard. *Id.* ("[The] language indicates that the right to be free from unreasonable searches under

16  Art. I § 13 of the California Constitution parallels the Fourth Amendment inquiry into the

17  reasonableness of a search.").  Given the court's conclusion above with respect  to plaintiff's federal

18  unlawful seizure claim, summary judgment as to plaintiff's state unlawful seizure claim is

19  GRANTED in favor of CHP defendants.

20                      3.      False Imprisonment

21          "False imprisonment under California law is the 'unlawful violation of the personal liberty of

22  another.'" *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1379 (9th Cir. 1998) (quoting *Asgari v.*

23  *City of Los Angeles*, 15 Cal.4th 744, 757 (1997)).  Where "confinement [is] pursuant to lawful

24  process" however, there is no false imprisonment. *Asgari*,15 Cal.4th at 757.  Given the court's

25  conclusion with respect to the reasonableness of the defendant officers' enforcement of the duly

26  enacted Master Ordinance, the court concludes that the CHP's fleeting detention of Turner was

27  lawful and  summary judgment is GRANTED in favor of defendants.

28

31

1

       4.     Cal. Civ. Code § 52.1

2

       An action based on Cal. Civ. Code § 52.1 is supported by any violation of the federal or state

3 constitutions. Cal. Civ. Code § 52.1(b). Because the court has denied summary judgement as to

4 plaintiff's state and federal constitutional claims, summary judgment as to this claim is DENIED.

5 IV.    Motion to Strike & Evidentiary Objections

6        The District's Motion to Strike is DENIED as MOOT as the court did not consider the

7 evidence in question in reaching its conclusions. The District also objects to various evidentiary

8 submissions proffered by plaintiff in support of plaintiff's opposition to defendant's motion for

9 summary judgment. The court now addresses the two relevant objections.

10        The District's objection to Bridge manager Kary Witt's deposition testimony referencing  the

11 District's response time to problems on the Bridge because it is irrelevant pursuant to Fed. R. Evid.

12 401 and Fed. R. Evid. 402 is DENIED. Witt's testimony is relevant to the issue of whether the

13 District's permitting requirements are narrowly tailored to address the District's ability to respond to

14 any disturbance presented by an individual or a small group protesting on the Bridge's sidewalks

15 with a sign.

16        The District's objection to Witt's deposition testimony relating to the District's experience

17 with Jeffrey Orth and his successor, who walked across the Bridge with an American flag on a

18 regular basis, because it is irrelevant pursuant to Fed. R. Evid. 401 and Fed. R. Evid. 402 is

19 DENIED. Witt's testimony is relevant to the issue of whether the District's permitting requirements

20 are narrowly tailored given the District's experience with unannounced expressive activity involving

21 a prop. The District argues that the testimony is proffered out of context, but in considering this

22 evidence, the court was mindful of the content and context of Witt's testimony both preceding and

23 following the statements at issue. Thus, to the extent the court relied upon the statements in

24 question, the court considered them in context.

25        The District's remaining objections are DENIED as MOOT as the court did not consider the

26 evidence in question in reaching its conclusions.

27

28

United States District Court

For the Northern District of California

1        Plaintiffs object to and move to strike various evidentiary submissions proffered by

2   defendants in support of defendants' respective motions for summary judgment.  Plaintiff's motion

3   to strike is DENIED.

4

5

6

7   CONCLUSION

8        With respect to plaintiff Blome's motion, summary judgment is GRANTED in favor of

9   plaintiff.

10        With respect to defendant District's motion, summary judgment is DENIED.

11        With respect to defendant CHP officers', summary judgment is GRANTED in part and

12   DENIED in part.

13        Defendants' motion to strike is DENIED.

14        Plaintiff's motion to strike is DENIED.

15

16

17        IT IS SO ORDERED.

18

19   Dated:  January 7, 2011

                  _____

20                   MARILYN HALL PATEL
                United States District Court Judge
                Northern District of California

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

33

United States District Court

For the Northern District of California

**ENDNOTES**

1.       In section F.1(a), "Expressive Activity" is defined as:

> Verbal, visual, literary, or auditory speech, communication, or conduct that is intended to convey a political, religious, philosophical, or ideological opinion, view, or message that likely would be understood by those who see or hear the speech, communication, or conduct to be such an opinion, view, or message. Expressive Activity includes, for example, demonstrating, protesting, marching, assembling, distributing written materials and holding signs.

2.       "I have had first-hand experience of coming [to the Bridge] without a permit and being restricted on what I can do while on the [B]ridge." Docket No. 66 (Nazer Decl.), Exh. A (Blome Depo.) at 81:14-16.

3.        "This combination of a general but narrow standard with a more specific alternative makes for a close fit with the governmental interests underlying the permitting requirement." *Food Not Bombs*, 450 F.3d at 1042.

4.       Section F.8(c) states in relevant part: "No sign may be larger than 3 feet x 2 feet." Witt Decl., Exh. K (Ordinance Amending Master Ordinance 2009) at 11.

5.       Defendants proffer various incident reports detailing instances of expressive activity that have caused problems on the Bridge.  None of the reports address the issue here which is the effect of a single person or a small group with a sign demonstrating on the Bridge and the degree to which imposing a permitting requirement helps the District to mitigate those problems.  For example, one report details an incident in which three individuals climbed the suspension cables of the Bridge an unfurled an oversized banner.  This resulted in significant delays and disruption of Bridge traffic.  This type of speech behavior does not resemble the behavior that plaintiffs seek to engage in and therefore has little bearing on the District's contention that individual or small group speech involving signs, etc., is too dangerous absent advanced notice.  Plaintiffs seek to carry signs that are in keeping with the District's size limits and to do so in an orderly fashion.  Defendants present no evidence that speaks to the particular dangers of this sort of behavior.

6.       *See supra* note 1.

7.       Section F.8(c) states in relevant part: "Standard and unaltered backpacks, purses, camera bags, and coolers, for example, are not considered props, unless they are used to direct or attract attention to convey a political, religious, philosophical, or ideological message." Witt Decl., Exh. K (Ordinance Amending Master Ordinance 2009) at 11.

8.       The District's experts opine that even one sign can cause serious driver distraction without presenting any tangible survey or study showing that one sign is *likely* to cause driver distraction.  For example, one expert states:

> The requirement of having a permit for . . . groups utilizing signs and/or props allows the District to monitor the progress of the participants and help facilitate the flow of vehicle and pedestrian traffic on the Bridge by bringing in California Highway Patrol officers and District employees.  The permit requirement also identifies participating groups that may have conflicting opinions and puts monitoring personnel on alert to prevent verbal debate or negative physical interaction that could push persons; involved or not; into traffic or otherwise cause injuries. Docket No. 72 (Cameron Decl.), Exh. 1 at 4.

Setting aside the conclusory nature of this expert's speculative pronouncements, the expert's statement

34

United States District Court

For the Northern District of California

suggests that the primary benefit of the permitting requirement is to simply inform the District in advance that expressive activity is going to take place. However, "the significant governmental interest justifying the unusual step of requiring citizens to inform the government in advance of expressive activity has always been understood to arise only when large groups of people travel together on streets and sidewalks." *Food Not Bombs*, 450 F.3d at 1039.

Another expert did not rely upon any personal observation of the effects of an individual with a sign on the Bridge's sidewalk, but rather avers that in writing his report, he relied in part upon "61 of the District's 'Incident Report Form' that were related specifically to the types of events that are the subject of this report." Docket No. 74 (Wachtel Decl.), Exh. 1 (Wachtel Report) at 11. A closer review of the report does not reveal any analysis with respect to alleged distractions or safety concerns related to a single speaker with a sign within the Master Ordinance's size limitations. In addition, the notable cases of expressive activity this expert highlights often involve groups larger than 50, who are not the subject of plaintiff's Blome's facial challenge, and makes no mention of the presence of signs or their contribution to the alleged problems caused by the demonstrations. *Id.* at 11-13. With regard to the District's permitting requirement, this expert ultimately concludes that, "it is appropriate for the District to subject [signs, props and musical instruments] to the permit process so that the District personnel can ensure that any such sign or props comply with size and height limits ..." *Id.* at 17. Given that nowhere in its arguments does the District suggest the purpose of taking the unprecedented step of applying a prior restraint on speech to an individual speaker is to ensure sign size compliance, this expert's testimony does little to advance the District's contention that this court should depart from Ninth Circuit precedent.

This expert also states that because, "prior research and my assessment in this matter demonstrate that drivers are under higher levels of cognitive demand, and have less margin for error, during periods of heavy traffic, I conclude that [section F.6(d), which prohibits expressive activity after 2:00 p.m. on weekends] is appropriate and reasonable." *Id.* Never mind that this assessment appears to contradict another of defendants' experts, Mr. Ruzak, who states that in times of increased traffic, expressive activity might actually pose less of a risk. Docket No. 92 (Manolius Decl.), Exh. 1 (Ruzak Depo.) at 44:22-45:14 ("[when the [B]ridge is congested, the expressive activity may be a lesser impact because you're traveling at 5 miles an hour . . .It's more when traffic is free flowing and they're distracted, [that] the potential for accidents is greater than when you're traveling 5 miles an hour stop-and-go and moving very slowly.")

9.      The District argues that, individuals who wish to engage in spontaneous speech using signs, props or musical instruments should pick another public forum in San Francisco, "just not[seek to do so] on the Bridge." District's Opposition at 21.

10.     The Bridge's manager testifies that Jeffrey Orth's flag-carrying across the Bridge was "featured at least very prominently in the Bay Area media if not nationally and CNN [sic], et cetera." Krishna Decl., Witt Depo. at 130:3-12.

11.     Defendants' witness recounts an incident in which a Bridge Captain was allegedly hit in the head with a picket sign some time in the 80's or early 90's. The witness has no personal knowledge of this alleged event, and defendants present no other evidence that a picket sign has been used as a weapon. Defendants' witness also testifies to an incident in which an umbrella injured another person on the Bridge. Veit Decl., Exh. 4 (Locati Depo.) at 62:9-12.

12.     In addition, the plaintiffs in *Foti* were allowed to bring flags, crosses, and plastic babies for use in their expressive activities. *Id.* at 634.

13.     *See supra* note 5; *see also* Krishna Decl., Witt Depo. at 24-26.

14.     Defendants' rationale for imposing the time restrictions is that when there is more traffic, expressive activity becomes more dangerous. Defendants' expert, Edward Ruzak, however states that, "[when the [B]ridge is congested, the expressive activity may be a lesser impact because you're

1  traveling at 5 miles an hour . . .It's more when traffic is free flowing and they're distracted, the potential
2  for accidents is greater than when you're traveling 5 miles an hour stop-and-go and moving very
   slowly."  Thus, Ruzak's testimony contradicts the District's contention that in times of greater traffic,
3  expressive activity involving signs, props or musical instruments engenders greater safety problems.

4  15.      Plaintiff Turner sues the CHP officers in both their individual and official capacities, however
   "[a]n official sued in his official capacity has the same immunity as the state, and is entitled to eleventh
5  amendment immunity." *Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir. 1992).  Thus, Turner may only
   sue the CHP officers in their individual capacities, and qualified immunity applies only insofar as they
6  are sued in their individual capacities. *Community House, Inc. v. City of Boise, Idaho*, 623 F.3d 945,
   965-66 (9th Cir. 2010).

7  16.      This is perhaps a testament to the arbitrary nature of the District's permitting requirements.
8  Much in the same way the District determines a picket sign, and not an umbrella, for example, is
   particularly vulnerable to unpredictable wind, the District believes an unpermitted sign on the Bridge's
9  sidewalks is more likely to lead to driver distraction than a flag held aloft in what amounts to the same
   vicinity.  The photograph reveals that the bright red Chinese flags likely posed a significant distraction
10 to drivers.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

36